UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN -- SOUTHERN DIVISION

SETARA TYSON,
     Plaintiff,

-vs-                             Case No. 13-cv-13490-JEL-LJM

STERLING RENTAL, INC., *et al.*,
     Defendants.

## PLAINTIFF'S RESPONSE TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

For the reasons set forth below, Ms. Tyson requests that the Court deny this

motion for summary judgment.

                                Respectfully Submitted,


                                By:   /s/ Carl Schwartz
                                Carl Schwartz (P-70335)
                                Lyngklip & Associates
                                Consumer Law Center, PLC
                                Attorney for Setara Tyson
                                24500 Northwestern Highway, Ste. 206
                                Southfield, MI 48075
                                (248) 208-8864
                                Carl@MichiganConsumerLaw.Com

Dated: December 22, 2014

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN -- SOUTHERN DIVISION

SETARA TYSON,
      Plaintiff,

 -vs-                          Case No. 13-cv-13490-JEL-LJM

STERLING RENTAL, INC., *et al.*,
      Defendants.

## BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### Issues Presented by Motion

1. *Does a plaintiff need to understand and be able to articulate the legal underpinnings of her claim in order to move forward with her case?*

2. *Did Setara Tyson commit fraud when she presented true and accurate copies of her pay stubs and signed a blank credit application?*

3. *Did Setara Tyson waive her right to pursue remedies for conversion when she refused to retrieve the vehicle that Defendants concede they took from her?*

4. *Does a creditor's claim of fraud by the consumer operate as a complete defense to claims for violation of the Truth In Lending Act?*

5. *Is Car Source a creditor for purposes of the Truth In Lending Act and the Equal Credit Opportunity Act?*

6. *Does the Economic Loss Doctrine Bar Ms. Tyson's claimed remedies for conversion and violation of Article 9?*

7. *Did Car Source violate the ECOA by falsely informing Ms. Tyson that her credit was approved.*

8. *Did Car Source violate the ECOA when it later refused to provide an adverse action notice?*

## Most Appropriate Authorities

Fed. R. Civ. P. 56

15 U.S.C. § 1602

15  U.S.C. § 1640

12 CFR 202.9

M.C.L. § 440.9620

M.C.L. § 600.2919a

*Aroma Wines & Equip., Inc. v. Columbian Distribution Servs., Inc.*, 303 Mich. App. 441 (2013)

*Crowley v. Detroit Garages*, 259 Mich. 170 (1932)

*Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143 (5th Cir.1983)

*Foremost Ins. Co. v. Allstate Ins Co.*, 439 Mich. 378 (1992)

*Grand Blanc Cement Prods., Inc. v. Ins. Co. of N. Am.*, 225 Mich. App. 138 (1997)

*Jochum v. Pico Credit Corp. of Westbank, Inc.*, 730 F.2d 1041(5th Cir. 1984)

*Michigan Pipe & Valve-Lansing, Inc. v. Hebeler Enterprises, Inc.*, 292 Mich. App. 479 (2011)

*Purtle v. Eldridge Auto Sales, Inc.*, 91 F.3d 797 (6th Cir. 1996)

*Riviere v Banner Chevrolet, Inc.* 184 F.3d 457(5th Cir. 1999)

*Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363 (1966)

*Thompson v. Galles Chevrolet Co.*, 807 F.2d 163 (10th Cir.1986)

## Introduction

Defendants bring this (fourth) dispositive motion seeking dismissal of Ms. Tyson's case.  At its core, Defendants complain of three principal problems.  First, Defendants argue that Ms. Tyson committed fraud in her credit application.  Second, Defendants argue that Ms. Tyson does not understand the legal underpinnings of the documents filed on her behalf by her attorney.  Third, Defendants argue that Ms. Tyson has refused to retrieve the vehicle that Car Source admittedly took from her.

Contrary to this view, the evidence in this case shows that Ms. Tyson presented all documents necessary for Defendants to properly ascertain her income.  Rather than relying on those documents and the tools at its disposal, Car Source manually input Ms. Tyson's income to reflect a false amount of income, overriding its own computer's warnings, and then blamed Ms. Tyson.  After attributing its own misstatements to Ms. Tyson, Car Source took Ms. Tyson's vehicle and demanded that she sign new contracts or pay more money.  When Ms. Tyson refused to cede to these demands, Car Source acted consistent with its posted policy and kept Ms. Tyson's down payment.  These actions constitute a conversion of Ms. Tyson's vehicle, a tort that does not require her to accept the return of goods that have been taken from her.

## Statement of Facts

On August 10, 2013, Ms. Tyson visited Sterling Retail, Inc. ("Car Source") with the intent to purchase a vehicle.  (See the Declaration of SeTara Tyson, attached

as Exhibit 2, ¶ 2, and the Declaration of Leslie Tyson, attached as Exhibit 3, ¶ 3.)  Ms. Tyson presented Car Source with her most recent pay stubs to establish her bi-weekly income.  (Exhibit 2, ¶¶ 4-7; Exhibit 3, ¶¶ 5-8; see also the pay stubs from McDonald's, attached as Exhibit 4.)  Ms. Tyson also provided Car Source with a copy of her most recent bank statement as further proof of her income.  (Exhibit 2, ¶ 9; Exhibit 3, ¶ 10; see also the Bank of America statement, attached as Exhibit 5.)  Car Source then used Ms. Tyson's pay stubs to calculate her income (See the video showing the credit application process system "CAPS" system, attached as Exhibit 6).  Mr. Kamil then provided Ms. Tyson with the second page of a credit application, which was blank at the time, for her signature.  (See the deposition transcript of Setara Tyson Deposition Transcript , attached as Exhibit 7, pp. 10, 67-68, 74.)  Ms. Tyson signed the blank page and returned it to Mr. Kamil.  (Exhibit 7, p. 67-68.)

Car Source informed Ms. Tyson that Credit Acceptance Corporation ("CAC"), the finance company for the transaction, had approved her credit application.  (Exhibit 2, ¶ 11; Exhibit 3, ¶ 12.)  Ms. Tyson then purchased a 2006 Chevrolet Cobalt (VIN: 1G1AL58F867600940) from Car Source.  (Exhibit 2, ¶¶ 12-13; Exhibit 3, ¶¶ 13-14; see also the Department of State Form RD-108, titled "Application for Michigan Title and Registration" (hereinafter referred to as the "RD-108"), attached as Exhibit 8.)  On the RD-108, a Car Source agent signed the following certification:

2

**I CERTIFY I SOLD THIS VEHICLE TO THE PURCHASER NAMED IN THIS FORM.** I WARRANT THE TITLE TO THE VEHICLE AND CERTIFY THAT THE VEHICLE IS SUBJECT ONLY TO THE SECURITY INTERESTS NAMED ABOVE.

(Exhibit 8, capital letters in original, bold added.) The purchaser named on the RD-108 is Ms. Tyson. (Exhibit 8.) Ms. Tyson gave Car Source a check for $1,200 from the Family Independence Agency for a down payment. (Exhibit 2, ¶¶ 18.)

At the top of the first page of the retail installment contract, Car Source is named as the "Creditor-Seller." (See the retail installment contract, attached as Exhibit 9, p. 1.) CAC is the "assignee" of the contract. (Exhibit 7, pp. 2, 4.)

Two days after Ms. Tyson purchased the vehicle, Car Source called Ms. Tyson and informed her that: (1) the deal for the vehicle had fallen through, (2) the paperwork needed to be re-written, and (3) Car Source needed to install a new GPS unit in Ms. Tyson's vehicle. (Exhibit 2, ¶¶ 23-24.) In response to the phone call, Ms. Tyson returned to Car Source with her vehicle. (Exhibit 2, ¶ 25; Exhibit 3, 17.) When she arrived, her salesman asked for her keys to install the new GPS unit. (Exhibit 2, ¶ 27, Exhibit 3, ¶ 20-21.) He took Ms. Tyson's car to the service bay, with the alleged purpose of installing the GPS unit. (Exhibit 2, ¶ 27; Exhibit 3, ¶ 21.) Instead, Car Source's employees removed all of Ms. Tyson's personal effects from the vehicle and dumped them at Ms. Tyson's feet. (Exhibit 2, ¶ 31; Exhibit 3, ¶ 26.) Ms. Tyson asked

what was going on and was told that (1) the deal had fallen through, (2) she had to give them her contract, and (3) she had to pay an additional $1,500 to keep the vehicle.  (Exhibit 2, ¶¶ 28, 34; Exhibit 3, ¶¶ 22, 28.)  When Ms. Tyson stated she could not pay another $1,500, Car Source employees refused to return Ms. Tyson's vehicle and subjected Ms. Tyson and her family to a torrent of insults and profane language.  (Exhibit 2, ¶¶ 29-30, 34; Exhibit 3, ¶¶ 24-25, 28.)

Car Source informed Ms. Tyson that she needed to remove the vehicle or face storage fees.  (Exhibit 2, ¶ 45.)  However, this alleged notification letter was sent six days after Ms. Tyson filed her Complaint.  (Complaint; Exhibit 2, ¶ 45.)  Ms. Tyson did not abandon her vehicle; it was taken from her by Car Source.  (Exhibit 2, ¶ 47.)  Ms. Tyson could not remove the vehicle from the Car Source lot, because Car Source took the keys to the vehicle when it was illegally repossessed.  (Exhibit 2, ¶ 47.)

Plaintiff deposed Jon Lun, who testified on behalf of CAC.  (See the deposition transcript of Jon Lun, attached as Exhibit 10.)  Mr. Lun testified, *inter alia*, regarding notes from CAC's servicing system ("CAC notes").  (See a redacted copy of the CAC notes, attached as Exhibit 11.)  The CAC notes "include system changes on the accounts and notes of discussions between [CAC's] servicing folks and anyone they talk to, a customer primarily."  (Exhibit 10, p. 8-9, brackets added.)

The CAC notes contain entries that contradict Defendants' statements.  One

4

such note, entered on August 12, 2013 at 6:55 p.m., states that Ms. Tyson was "upset stating that the dealer is stating she can't keep this car." (Exhibit 10, p. 13; Exhibit 11, p. 1.) On August 20, 2013 at 2:56 p.m., a note was entered that Ms. Tyson

> called in to advise that dealer took car from her and she wanted to keep the vehicle. She brought vehicle to dealer for a minor repair and the dealer wouldn't give it back. Dealer not stating why took the car. Customer already had plates and insurance. Dealer stating she cannot get vehicle back and the dealer had the right to take the car back. . . .

(Exhibit 10, p. 15; Exhibit 11, p. 3.) These notes (and others) by CAC contradict Defendants' bald allegations that Plaintiff abandoned her vehicle. To the contrary, Ms. Tyson complained to CAC that she wanted to keep the vehicle, but that Car Source took it and refused to return it or Ms. Tyson's down payment. Car Source has a stated policy that "any fraudulent documents/pay-stubs, and/or misleading information submitted to purchase a vehicle will result in the complete loss of your down payment." (See a sign in the window of Car Source, attached as Exhibit 12.)

Mr. Lun also testified that dealerships (such as Car Source) are trained to use the "CAPS" system to process credit applications, including processing information from Ms. Tyson's pay stubs. (Exhibit 10, p. 29.) He testified that "the dealer can enter anything he likes into CAPS as part of the application process" and that the dealer "enters what on [sic] the stubs or he can enter whatever he chooses . . . ." (Exhibit 10, p. 28.) He further testified that if the dealer "use[s] our income calculator

5

they'll get the same answer we do, if they just type an amount in it will be whatever they type in." (Exhibit 10, p. 29.) He further testified that "what's on the application is what [Car Source] entered." (Exhibit 10, p. 32, brackets added.) Ultimately with respect to this issue, Mr. Lun testified as follows:

> Q:   Okay. So let me make sure I'm understanding this correctly. Based on what you're telling me I'm understanding that there's a couple ways that the system can calculate the income level and one of them is automatically calculating it using the pay periods and there's another way that it can do it and the dealer chose the wrong way to do it, is that what I'm getting?
>
> A:   I'm not sure if he chose the wrong way to do it or just entered it incorrectly, yeah, in any event, he got the wrong answer.

(Exhibit 10, p. 45.)

* * * * *

> Q:   . . . If I understand your testimony correctly, the dealer, when they data enter this, will receive the exact same warnings that your analyst will receive, is that correct?
>
> A:   Yes.
>
> Q:   So this dealer would have known that he had improperly entered this information?
>
> A:   He would have known that there was a -- there was something that we were going to need an answer for, he would have known something didn't add up.

6

(Exhibit 10, pp. 46-47.)   (See also Exhibit 6.)   Mr. Lun further testified that Car Source alone decided: whether to initiate a contract with Ms. Tyson; the terms of the transaction; the amount of the down payment; the amount of the interest rate; the amount of monthly payments; and all other terms.  (Exhibit 10, pp. 56-57.)

### Standard of Review

The court may "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must "decide 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir.2013) (citing Anderson, 477 U.S. at 251–52).  The Court must review inferences from the facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

### "Spot Deliveries" and "Yo-Yo" Sales are Illegal under Michigan Law

A "spot delivery" occurs when a car dealer and a buyer sign an installment contract for the sale of a vehicle and the buyer takes delivery of the vehicle "on the spot," before the dealer has secured a final commitment of a finance company to take

assignment of the contract. As in all retail installment sales, the installment contract identifies the dealer as the "creditor" and identifies a finance company who is expected to take assignment of the loan from the dealer.

The term "yo-yo sale" refers to post-sale conduct by dealers in connection with a "spot delivery" when the dealer is unable to complete the assignment of the contract. In a "yo-yo sale," the dealer brings the consumer back to the dealership to either repossess the vehicle or pressure the consumer into signing new paperwork with terms less favorable to the consumer than those previously negotiated with the dealer. In those cases, the buyer must either pay the balance in full, return the vehicle or sign new paperwork, even though they have already executed a valid contract. Regardless of whether a separate document reserves the dealer's right to repossess the vehicle, the dealer treats the transaction as conditional and claims the right to retrieve the vehicle if it cannot assign the retail installment contract.

The State of Michigan formally recognized the illegality of this practice as unfair and deceptive in a 1989 policy letter written by Murray Brown, the Deputy Commissioner to the Department of Commerce, and has held it illegal under the Motor Vehicle Sales Finance Act, M.C.L. § 492.101 *et seq*. ("MVSFA"). (Murray Brown Letter, Exhibit 13). Shortly after that, the licensing body for car dealers likewise recognized and banned aspects the practice by licensed dealers. (Dealer

8

Manual, Exhibit 14). The State of Michigan has also provided a consumer bulletin advising of the illegality of this practice. (Consumer Bulletin, Exhibit 15). The Department of Insurance and Financial Services has twice updated the Murray Brown letter with formal bulletins dated (Bulletin 2010-20-CF, Exhibit 16; Bulletin 2013-08-CF, Exhibit 17) and expanded the analysis of the MVSFA's prohibition.

Since these declarations by the State's instrumentalities, the Michigan Auto Dealer's Association has taken steps to advise dealers (MADA Bulletin, Exhibit 18) and the Federal Trade Commission has initiated proceedings to rein in rogue dealers (FTC Roundtable Agenda, Exhibit 19), which has prompted an acknowledgment by the National Auto Dealer's Association that these practice fall outside the bounds of legal and ethical conduct by dealers. (NADA Comments at 7-9, Exhibit 20.)[1]

## Law & Argument

**1.    Car Source created the false information concerning Ms. Tyson's income.**

The only information provided by Ms. Tyson were the documents supporting her income. (Exhibit 7, pp. 71-73.)  Car Source, however, improperly entered the

---

[1]In their brief, Defendants urge this court to rely on *Rucker*, *Janikowski* and *Tripp* for the proposition that spot deliveries are not illegal and fraudulent *per se.*  Each of these cases arose from transactions outside Michigan and are not therefore regulated by the MVSFA. Additionally, these cases do not address the specific theories of liability that are at issue in this case. *Rucker* addressed the narrow issue of whether the disclosures in the second agreement violated TILA by calculating the annual percentage rate of interest on the basis of the date on the backdated agreement.  In both *Anderson* and *Janikowski,* the plaintiffs agreed to a second contract.  These cases are inapposite to the facts here.

9

information into the CAPS system (Exhibit 10, pp. 32, 45.) and consequently miscalculated the erroneous information that it now claims that it relied upon (Exhibit 6; Exhibit 10, pp. 46-47.)  As such, Car Source itself was the author of the information which Car Source claims that it relied on to approve Ms. Tyson for credit.

If Car Source's employee had used the income calculator in the CAPS system to prepare Ms. Tyson's credit application, the credit application would have properly reflected the amount of Ms. Tyson's income based upon her pay stubs.  Instead, the credit application stated a different amount, which was entered by an employee of Car Source and which did not come from Ms. Tyson or from her proof of income. (Exhibit 2, ¶¶ 4-7, 9; Exhibits 4; 5; 10, pp. 28-29.)  Moreover, Car Source received a warning from the CAPS system that there was an error.  (Exhibit 6; Exhibit 10, pp. 46-47.)  Instead of following the instructions on the warning screen and contacting CAC for instructions on how to calculate the information, Mr. Kamil altered the numbers and ignored the warning.  (Exhibit 6; Exhibit 10, pp. 45-47.)

2. **Ms. Tyson need not understand her claims in order to pursue her claims.**

Defendants argue that the Court must dismiss Ms. Tyson's claims because she cannot articulate their legal underpinnings.  (Defendants' motion, pp. 10, 11, 13, 15, 17.)  In effect, Car Source argues that if Ms. Tyson does not understand the laws that protect her, she is not worthy of their protection.  Car Source cites no case law in

10

support of its novel view of the justice system.

To the contrary, a plaintiff need not possess knowledge of the law or the capacity to articulate a legal theory. Plaintiffs may rely upon the knowledge of their attorneys. The United States Supreme Court established this principle in the context of Fed. R. Civ. P. 23 and held that the disavowal of a claim does not bar an otherwise well-stated and properly supported claim tendered by the plaintiff's attorney:

> . . . . The Court of Appeals in affirming the District Court's dismissal, however, indicated that whether Mrs. Surowitz and her counselors acted in good faith and whether the charges they made were truthful were irrelevant once Mrs. Surowitz demonstrated in her oral testimony that she knew nothing about the content of the suit. That court said:
>
> 'Those affidavits reveal that substantial and diligent investigation by Brilliant, Rockler and others preceded the filing of this complaint. * * * Neither affidavit, however, does anything, if anything could be done, to offset plaintiff's positive disavowal of any relevant knowledge or information other than the fact of her stock ownership.' 342 F.2d, at 607. . . .
>
> **We cannot construe Rule 23 or <u>any other one of the Federal Rules </u>as compelling courts to summarily dismiss, without any answer or argument at all, cases like this where grave charges of fraud are shown by the record to be based on reasonable beliefs growing out of careful investigation**.

*Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363 (1966) (emphasis added). See also

*Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 337 (S.D.N.Y. 2010) (citing *Cromer*

*Finance Ltd. v. Berger*, 205 F.R.D. 113, 123 (S.D.N.Y. 2001) (plaintiffs may rely "on

their attorneys to articulate the ... legal theories that apply to their claims"). The

11

failure of a plaintiff to articulate a theory of the case may not serve as a basis for dismissal if counsel can tender competent evidence to support the client's claim.

**3.    Defendant's offer to return the stolen vehicle does not operate as a defense to the claims of conversion.**

Conversion is "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins. Co. v. Allstate Ins Co.*, 439 Mich. 378, 391 (1992). Statutory conversion is knowingly "buying, receiving, or aiding in the concealment of any stolen, embezzled, or converted property...." M.C.L. 600.2919a.

Defendants argue that the Court must dismiss Ms. Tyson's conversion claims based upon her refusal to retrieve her car. Defendants concede that they took Ms. Tyson's vehicle from her and argue that their offer to return the vehicle bars any recovery. Citing no authority, Defendants claim that Ms. Tyson had a duty to retrieve her vehicle. However, a victim of conversion is not required to retrieve wrongfully-taken goods. "As a general proposition, when an actual conversion of chattels has taken place, the owner is under no obligation to receive them back, when tendered by the wrongdoer." *Crowley v. Detroit Garages*, 259 Mich. 170, 174 (1932).

Ms. Tyson had no duty to retrieve her converted vehicle from Defendants.

**4.    Ms. Tyson has presented sufficient evidence to raise a genuine issue of material fact concerning her Truth in Lending Act ("TILA") claims.**

12

a.    **Car Source is the "creditor" for purposes of TILA.**

Defendants claim that CAC, not Car Source, was the "creditor" for purposes of

TILA and that the Court may not hold Car Source liable for violations of TILA.

(Defendants' Motion at ¶1 and 4, R. 33 at Pg. ID 289 and 291). However, the retail

installment contract submitted by Defendants identifies Car Source as the "Creditor-

Seller." (R. 6-1, Pg ID 38; see also Exhibit 9 attached to this response.)

TILA identifies sellers to whom retail installment sales contracts are initially

payable as creditors.[2]  15 U.S.C. § 1602(g); Reg Z §1026.2(a)(17)(I), 12 CFR

226.2(a)(17)(I); *Riviere v Banner Chevrolet, Inc.* 184 F.3d 457(5th Cir. 1999). See

e.g. *Cornist v. B.J.T. Auto Sales, Inc.*, 272 F.3d 322 (6th Cir. 2001); *Bragg v. Bill

Heard Chevrolet, Inc.,* 374 F.3d 1060 (11th Cir. 2004); *Ellis v. GMAC*, 160 F.3d 703

(11th Cir.1998).  Assignees are not creditors for purposes of TILA.  Official

Interpretations, § 1026.2(a)(17)(I)-2.

In this case, the evidence establishes that Car Source is the creditor of the retail

installment sales contract. (Exhibit 9.) Car Source is a creditor for purposes of TILA.

b.    **Allegations of fraud by Ms. Tyson do not defeat claims under TILA.**

Defendants argue that the TILA claim should be dismissed due to an alleged

---

[2]Car Source is also a "creditor" for purposes of the ECOA. *Treadway v. Gateway
Chevrolet Oldsmobile Inc.*, 362 F.3d 971 (7th Cir.  2004);  *Bayard v. Behlmann Auto. Servs., Inc.*,
292 F. Supp. 2d 1181, 1185 (E.D.Mo.2003) (noting that an automobile dealership "would be
considered a creditor as one who regularly arranges for the extension of credit.")

13

fraud by Ms. Tyson.  (R. 33 at ¶ 7, Pg ID 291).  However, allegations of fraud by a

consumer does not bar claims under TILA:

> On the other hand, Purtle argues that her alleged misrepresentations of
> her financial condition are no defense to Eldridge's violation of the
> TILA. . . . This Court agrees with the reasoning of the Fifth Circuit Court
> of Appeals in Grant. According to that Court, "once the court finds a
> violation, no matter how technical, it has no discretion with respect to the
> imposition of liability." Id. at 510. See also *Williams v. Public Finance
> Corporation*, 598 F.2d 349 (5th Cir.1979) . . .

*Purtle v. Eldridge Auto Sales, Inc.*, 91 F.3d 797, 801 (6th Cir. 1996).  Under this rule,

any claim of misrepresentation by the consumer does not bar a TILA claim.

### c.   Ms. Tyson need not show reliance to recover TILA's statutory damages under 15 U.S.C. § 1640(a)(2).

Defendants argue that Ms. Tyson cannot recover under TILA because she has

not shown detrimental reliance.  However, Ms. Tyson seeks only statutory damages,

not actual damages.  Under TILA, a consumer may pursue statutory damages even

without detrimental reliance. 15 U.S.C. § 1640;  *Vallies v. Sky Bank*, 591 F.3d 152,

158 (3d Cir.2009);  *McGowan v. King, Inc.*, 569 F.2d 845, 848-849 (5th Cir.1978);

*Dryden v. Lou Budke's Arrow Fin. Co.*, 661 F.2d 1186, 1191 (8th Cir.1981).

Nonetheless, Defendants argue that the Court must dismiss Ms. Tyson's claims

for want of payment of any finance charges.  (Defendants Motion, p. 12.)  Citing

*Anderson v Frederick Ford Mercury*, Defendants argue that no damages may be

awarded under 15 U.S.C. § 1640(a)(4) unless the plaintiff has paid finance charges.

14

While *Anderson* clearly sets forth this rule, the *Anderson* court plainly erred. Damages under closed-end credit arise under § 1640(a)(2), not § 1640(a)(4). While § 1640(a)(4) limits statutory damages to finance charges paid, these damages apply only to violations of *§ 1639 that facially applies only to mortgages*. On the other hand, damages arising under § 1638 are subject to the presumptive damage awards in § 1640(a)(2), which provides for twice the finance change and does not require payment of those charges as a prerequisite to recovery of damages. The *Anderson* court simply applied the wrong rule. Notably, no court has followed *Anderson*'s damage analysis. As such, Ms. Tyson may pursue her claim for statutory damages.

**5.**  **Ms. Tyson's has presented sufficient evidence to support a claim for violation of theEqual Credit Opportunity Act ("ECOA").**

**a.**  **Car Source is the party to whom Ms. Tyson's contract is initially payable, and is therefore a creditor for purposes of ECOA.**

The ECOA defines "creditors" as those who regularly "extend" or "arrange" for credit. 15 U.S.C. § 1691a(e). Regulation B expands the definition to include all persons who *set the terms of credit*. 12 CFR 202.2(l). Under both tests, one who regularly "extends" credit is a creditor.

"Extending" credit means granting the right to defer payment. *Midkiff v. Adams County Regional Water District*, 409 F.3d 758, 771 (6th Cir. 2005) ("Under the ECOA, a creditor is one who grants a right 'to defer payment of debt . . . and defer its

15

payment or to purchase property or services and defer payment therefor.'"); *Mays v. Buckeye Rural Elec. Co-op., Inc.,* 277 F.3d 873, 875 (6th Cir. 2002).

TILA uses the same "extend" credit language in its definition of "creditor" as in the ECOA.  Thus, the ECOA definition of "creditor" necessarily subsumes any person who already meets the TILA definition of "creditor."  Car dealers who sell vehicles under installment contracts satisfy the TILA (and by extension ECOA) definition of creditor.  *Riviere v. Banner Chevrolet, Inc.*, 184 F.3d 457 (5th Cir. 1997).  Any retail installment contract seller extends credit for purposes of TILA.  12 CFR 226, Supp. I, Subpt. A, Cmt. 2(a)(17)(I)(2).

Meanwhile, "installment sellers" under the MVSFA are defined as the contracting parties to an agreement to permit deferral of payment under a schedule of regular payments called a "retail installment contract."  Such contracts constitute a deferral of payment and constitute "credit" for purposes of the MVSFA, TILA, and ECOA. *Michigan Pipe & Valve-Lansing, Inc. v. Hebeler Enterprises, Inc.*, 292 Mich. App. 479, 491(2011); *Grand Blanc Cement Products, Inc. v. Insurance Co. of North America*, 225 Mich. App. 138, n3 (1997); M.C.L. § 438.31(2).

In this case, Car Source operates as a retail installment seller of automobiles and named itself as a creditor in that contract.  (Exhibit 9.)  That contract names Car Source as the party to whom the agreement is initially payable.  (Exhibit 9.)  Car

Source determines the nature of the contract after receiving approval from third-party finance companies, identifying the rates that those companies would find acceptable to purchase.  (Exhibit 10, pp. 56-57.)  Car Source is a creditor under the ECOA.

> **b.**   **Car Source regularly "arranges" or "participates" in the setting of terms and conditions of credit which will be offered to consumers, and is therefore a "creditor" under the ECOA and Regulation B.**

Car Source also meets the second prong of the ECOA's definition of a "creditor."  A person who "arranges" credit falls within the definition of a creditor. *Compare*,  *Ford Motor Credit Co. v. Cenance*, 452 U.S. 155, 157-158 (1981).

While the plain language of the ECOA and case law interpreting the language used in it hold car dealers to be creditors, Defendants nonetheless argue that Car Source does not fall within that definition.  Defendants cite to *Treadway* for the proposition that car dealers are not creditors.  In so doing, Defendants maintain that Car Source merely "submits credit applications to financiers" and thus does not satisfy the definition of "creditor," thus falling within the exclusion in the regulation.

This argument misunderstands the test in *Treadway*.  Contrary to Defendants' argument, *Treadway* is not a blanket exemption for dealers, but rather a functional test of the dealer's participation.  Under *Treadway*, dealers who set terms, split fees or negotiate rates, are creditors.  Entities that actively engage in the setting of credit terms, down payments, interest rates and other conditions will meet the functional test

17

in *Treadway*.  Moreover, a dealer that executes a retail installment sales contract identifying the dealer as a creditor may likewise be deemed a "creditor" for purposes of ECOA.  *Simmons v. Expo Enterprises, Inc.*, 2014 WL 3565624 (M.D. La. 2014).

In this case, Car Source: (1) holds a license as a retail installment seller of motor vehicles; (2) receives credit applications and considers a consumer's credit; (3) sets preliminary credit terms and submits them to CAC; (4) selects assignees who will receive assignment of the installment contract; (5) negotiates and sets the final terms of credit directly with the consumer; (6) prepares and executes installment sale contracts which identify Car Source as the "creditor" to whom the original note is payable; (7) grants the right to consumers to pay contracts over time; (8) receives "down payments" for contracts signed and enforceable by Car Source; (9) sells installment contracts to assignees ***only after*** it delivers vehicles under credit contracts; and (10) reserves the right to unwind the transaction in the event that a sale falls through.  Car Source is undeniably a creditor for purposes of the ECOA.

### c.      Ms. Tyson need not claim discrimination to bring suit under ECOA.

Defendants argue that Ms. Tyson cannot proceed under the ECOA because she has not alleged discrimination.  However, the notice requirements of the ECOA stand independent of its anti-discrimination features.  *Jochum v. Pico Credit Corp. of Westbank, Inc.*, 730 F.2d 1041, n3 (5th Cir. 1984); *Sayers v. General Motors*

18

*Acceptance Corporation*, 522 F. Supp. 835, 840 (W.D. Mo. 1981).  A consumer need not allege discrimination to enforce the notice provisions of the ECOA.  *See Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143, 145–47 (5th Cir.1983); *Cross v. Prospect Mortg., LLC,* 986 F. Supp. 2d 688, 693 (E.D.Va. 2013)*.*  A creditor may violate the ECOA regardless of whether it engaged in any discrimination. *Thompson v. Galles Chevrolet Co.*, 807 F.2d 163, 166 (10th Cir.1986); *Jochum, supra*; *Coulibaly v. J.P. Morgan Chase Bank, N.A.* 2012 WL 3985285, *4 (D. Md. 2012).

Since Ms. Tyson has alleged violations of ECOA's notice provisions, the Court should reject Defendants' argument that she must allege or prove discrimination.

### d.   A claim is not premature where Car Source sent a notice, but that notice did not comply with the requirements of ECOA.

Defendants argue that Ms. Tyson's claims are premature.  This argument fails to account for the theory alleged by Ms. Tyson in her Complaint.  Ms. Tyson alleged that Car Source violated the ECOA by providing her with a false notice of approval. (Complaint, ¶¶ 59-61.)  This theory relies upon the requirement that a creditor provide notice of its credit decision to the consumer.  12 CFR 202.9.  If the creditor approves credit, that notice may be verbal and need not be in writing.  *Id.*  However, whatever notice is given must be truthful and accurately describe that action.  *Fischl v. General Motors Acceptance Corp.,* 708 F.2d 143, 146 (5th Cir.1983).

In this case, the complaint alleged that the initial notice was false.  Ms. Tyson's

19

claim arose at the time of the violation -- when Car Source delivered the false notice.

## 6. Ms. Tyson may recover liquidated statutory damages for Car Source's violation of Article 9.

Defendant argues that Ms. Tyson may not recover under Article 9 of the U.C.C. Under Article 9, a party may only recover secured goods if the debtor has defaulted on the note. M.C.L. § 440.9609. If the secured party proceeds contrary to Article 9, the debtor may sue for statutory damages. M.C.L. § 440.9625. Likewise, the debtor may pursue remedies for conversion. M.C.L. § 440.9620 comment 12.

In this case, Defendants claim that they were permitted to retake the vehicle and demand more money from Ms. Tyson, because Defendants claim that Ms. Tyson committed fraud on her application. Notwithstanding these arguments, the undisputed evidence shows that Ms. Tyson provided full disclosure of her wages and all facts necessary for Defendants to calculate her income. Defendants themselves miscalculated, and then misstated, her income and knew at the time that they had done so. In spite of this, Defendants sold the vehicle to Ms. Tyson. When their own fraud was discovered by CAC, Defendants retook the vehicle from Ms. Tyson.

Under these facts, Ms. Tyson may properly recover under Article 9.

## 7. The Economic Loss Doctrine does not bar Ms. Tyson's claims for conversion or violations of Article 9.

Defendants argue that the conversion claim is barred by the Economic Loss

Doctrine. First, the doctrine precludes tort actions for breaches of contractual duties unless the plaintiff could maintain the action independently even if no contractual relationship between the parties had existed. *Hart v. Ludwig*, 347 Mich. 559, 565 (1956); *Quest Diagnostics, Inc. v. MCI WorldCom, Inc.*, 254 Mich. App. 372, 376 (2002); *Sherman v. Sea Ray Boats, Inc.*, 251 Mich. App. 41, 48, (2002).

The duty to refrain from interfering with another's possession arises independent of any rights in the retail installment contract. Michigan law recognizes the tort of conversion as an "independent claim" and Ms. Tyson's damages arise wholly apart from any contract remedy. Because conversion stands as in independent tort, the Economic Loss Doctrine does not bar Ms. Tyson's claims for conversion.

Second, M.C.L. § 600.2919a(2) expressly provides that its remedies are available in addition to any other remedies. As such, the legislature has expressly negated any operation of the Economic Loss Doctrine to statutory conversion.

With respect to acts of conversion involving an Article 9 contract (the Retail Installment Sales Contract), the same result follows. Article 9 preserves these rights and relies on conversion remedies as supplements to its own remedies. M.C.L. § 440.9626 Comment 2. ("In a proper case, the secured party also may be liable for conversion under non-UCC law."); M.C.L. § 440.9620 Comment 12. ("Remedies available under other law, including conversion, remain available under this Article

21

in appropriate cases"). Simply put, Article 9 contradicts Defendants' position.

## <u>Conclusion</u>

For the reasons set forth above, Ms. Tyson requests that the Court deny the

Defendants' motion for summary judgment in its entirety.

Respectfully Submitted,

By:   /s/ Carl Schwartz
Carl Schwartz (P-70335)
Lyngklip & Associates
Consumer Law Center, PLC
Attorney for Setara Tyson
24500 Northwestern Highway, Ste. 206
Southfield, MI 48075
(248) 208-8864
Carl@MichiganConsumerLaw.Com

Dated: December 22, 2014

22